IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

WILLIAM G. SCOTT                                                    PETITIONER

VS.                                          CIVIL ACTION NO 3:10cv421-DPJ-FKB

RON KING                                                            RESPONDENT


## REPORT AND RECOMMENDATION

William G. Scott was convicted of capital murder in the Circuit Court of the First

Judicial District of Hinds County, Mississippi and sentenced to life without the possibility of

parole.  His conviction and sentence were affirmed on appeal, and his motion for post-

conviction relief was denied.  Presently before the Court is his petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  Having considered the petition, the response,

Scott's traverse, and the state court record, the undersigned recommends that habeas

relief be denied.

## I. FACTS AND PROCEDURAL HISTORY

On the morning of July 9, 2002, Paula Kay Dinkins was shot during an armed

robbery at her place of employment, the Cash Depot in Jackson, Mississippi.  She was

found dead in front of an empty safe that had previously contained $2,200.  Approximately

two weeks later, Jackson Police Department officers developed William G. Scott as a

suspect. After learning that Scott was living in Marietta, Georgia, the officers notified

Georgia law enforcement authorities of outstanding Rankin County, Mississippi

misdemeanor warrants for Scott, and Marietta police arrested him.  When Jackson

officers arrived to question Scott, he confessed to the robbery and murder.

Scott was indicted and tried for capital murder. He was represented by appointed counsel, Mike Knapp.[1] The primary evidence against Scott consisted of his confession. The jury convicted him, and he was sentenced to life without parole. On appeal, the Mississippi Court of Appeals reversed and remanded, finding that the trial judge's failure to recuse herself had resulted in a denial of due process and that Scott was entitled to an evidentiary hearing on his speedy trial claim. *Scott v. State*, 8 So. 3d 871 (Miss. Ct. App. 2008). The Mississippi Supreme Court granted a writ of certiorari, reversed the decision of the court of appeals, and reinstated and affirmed the conviction and sentence. *Scott v. State*, 8 So. 3d 855 (Miss. 2009). Scott filed a petition for writ of certiorari with the United States Supreme Court, which was denied on February 22, 2010. Scott then filed a motion for post-conviction relief, which was denied.

In his § 2254 petition, Scott raises the following grounds for relief:

1.  He was denied his due process right to counsel and his right to be present at all critical stages of the trial.

2.  The trial judge's failure to recuse herself resulted in a denial of due process.

3.  Scott's Sixth Amendment right to a speedy trial was violated.

4.  The following acts and omissions by his defense attorney constituted ineffective assistance of counsel:

    A.  Failure to object to Scott's detention in Georgia;

    B.  Failure to investigate his alibi;

_____

[1]Knapp was employed by the Hinds County Public Defender, Tom Fortner. Fortner handled Scott's arraignment and some other pretrial matters. Another attorney from that office, Sharon Witty, assisted Knapp at trial. However, Knapp appears to have been Scott's primary attorney prior to trial, and he was the only defense attorney who actively participated at trial. Unless otherwise noted, all references herein to defense counsel are intended to refer to Knapp.

C.      Failure to interview two crime scene witnesses;

D.      Failure to view a potentially exculpatory videotape;

E.      Failure to object to the admission of evidence of Scott's previous crime of embezzlement, his desertion from the military, and his charges for possession of an altered social security card and stolen license plate;

F.      Failure to object to the prosecutor's improper statements during closing argument; and

G.      Informing the trial judge of Scott's confession and intention to commit perjury.

## II. EVIDENCE PRESENTED AT TRIAL

Paula Dinkins was the manager of the Cash Depot on Ellis Avenue in Jackson, Mississippi. On the morning of July 9, 2002, she woke her husband to tell him goodbye and left for work. With her were her two oldest children, whom she normally dropped off at summer school before going to the office. Opening time for the business was 9:00 a.m. The assistant manager, Antoine Reed, arrived that morning at approximately 8:46 a.m. When he walked through the front door into the reception area, he found Curtis Hearon, a frequent customer, sitting at the table. The lights were off in the office area behind the glass window at the front counter, where Dinkins usually sat. Reed asked Hearon where Dinkins was, and Hearon replied that he had not seen her. Reed then walked back into the office and discovered Dinkins in a kneeling position in front of the open safe and in a pool of blood. She was pronounced dead at the scene. A Wolf 9 mm Luger shell casing was found at the scene, but no projectile was recovered. An autopsy revealed that Dinkins had died from a gunshot wound to the back of the head, about four inches below

the top.   According to the pathologist, Dr. Steven Hayne, the lack of residue or other signs of a close range firing indicated that the victim had been no closer than 18 to 24 inches away from the gun when it fired.  Hayne testified that the wound was consistent with a 9 millimeter or other large caliber projectile from a handgun.  The safe was missing $2,200, the amount Reed had deposited into it the night before.

When interviewed by investigating officers, Reed told them that on the previous weekend, Dinkins had recounted an incident at the Cash Depot involving William Scott, a frequent customer.  Reed stated that Dinkins told him that Scott had come to the Cash Depot to obtain money and had tried to coerce Dinkins out of the office.  Reed also told the officers that later in the day after the robbery and murder, he saw Scott drive slowly by the Cash Depot.

Upon learning that Scott had attended Hinds Community College, officers inquired there and learned that Scott had dated Tamika Wray, also a student, for several months.  Their interview with Wray led the officers to consider Scott a suspect.  Wray informed the officers that she and Scott had recently ended their relationship and that he had moved to the Atlanta area.  Wray provided contact information for Scott.

Investigators contacted the Marietta, Georgia police department and had Scott arrested on two outstanding Rankin County, Mississippi misdemeanor warrants.  Jackson Police Officers Keith Denson and Allen White traveled to Georgia and interviewed Scott. Denson and White testified that they read Scott his Miranda rights and obtained his signature on the rights and waiver forms.  They then began the interview, during the first part of which Scott denied any knowledge of the robbery and murder.  Eventually,

however, he began to cry and stated that he "didn't mean to kill her." Scott then gave a detailed statement, in which he explained that he had been very upset about his break-up with Wray, which was partly the result of financial problems. During the first week in July, after the break-up but while they still had contact, Wray asked him for money. He told her he did not have any at the time but asked that she give him a few days to get some. On the morning of July 9, he went to the Cash Depot, which he frequented. When he looked around in his car to find something with which to frighten either Paula or Antoine, Scott remembered that in his backpack was a gun he had obtained from an acquaintance, Marcus Bennett. Scott arrived at the Cash Depot about the same time as did Dinkins, and Scott followed her into the building. When Dinkins opened the office door, Scott pulled out his gun and asked for money. Dinkins went to the safe and removed cash. Dinkins then tried to get up, but her head jerked back, causing Scott's gun to fire. Scott left with the cash and the gun. Thereafter, he used the money to pay some bills, redeem items from a pawn shop, buy clothing, and take Wray out to eat. He also gave some of the money to Wray. Later on the day of the crime, he drove by the Cash Depot but did not stop. He threw the gun away after he arrived in Atlanta. He burned the remaining cash, about $400, out of guilt.

Marcus Bennett informed officers that he had recently sold a loaded handgun to Scott. Although Scott had promised payment in the form of a radio, Scott never gave the radio to Bennett. Bennett provided the officers with a box of Wolf 9 mm Lugers, indicating that this was the same type ammunition that was in the gun when he sold it to Scott.

Scott took the stand at trial. He claimed to have slept until early afternoon at his home on the day of the crime. He left home that afternoon, paid some bills, shopped, and took Wray out to eat. Scott explained that he had a lot of cash because he had won it gambling the night before in Vicksburg. The following Sunday, he and Wray argued and ended their relationship. He went to her house and retrieved some personal belongings, gave her some money, and drove to Atlanta. Subsequently, he talked to Wray and learned that two police officers were asking about him. He obtained the phone numbers of the officers, Allen White and Keith Denson, and called and talked with them. He was arrested later that evening and taken to jail, where he was interviewed by White and Denson.

In his testimony, Scott attacked the validity of his confession on several somewhat inconsistent bases. He denied ever having been read his Miranda rights, stated that the signature on the waiver form was not his, and testified that he had asked for an attorney prior to the interview. He claimed that he was pressured to confess by Denson and White. According to Scott, White showed him a picture of a lethal injection table and told him he would end up there if he did not cooperate. Scott also claimed that White and Denson had told him that his roommates and Wray were in custody but would be released if he confessed. Finally, Scott denied having initialed and signed most of the pages of the statement that was admitted into evidence. He testified that he did not have time to review the statement before he signed it. Yet, he claimed that the actual statement he signed was consistent with his version of the events as set forth in his trial testimony. The premise of Scott's testimony about his written statement was that a second version

implicating him in the crime had been prepared after his interview, that his initials and signature had been forged on it, and that it had been substituted in the place of his true written statement.

Mary Holden testified as the only other defense witness. Holden was walking near the Cash Depot around 8:50 a.m. on July 9. She stated that she saw two black men coming out of the Cash Depot walking hurriedly.

Tamika Wray testified for the prosecution in rebuttal and gave an account of Scott's activities and behavior during the relevant time period. On the evening of July 9, she and Scott went out in Scott's automobile. Wray observed approximately $900 to $950 in cash in the glove compartment, a circumstance that Wray described as "very unusual." Later in the evening, Scott pulled a large wad of cash from his pocket. When Wray questioned him about the money, Scott responded that something had "come through" for him. Wray also observed a gun in his car and stated that she had never before seen him with a gun. Scott asked her to take the money and keep it for him. The following Sunday they argued, and she ended the relationship. Scott came by her house, retrieved the cash, and left town.

### III. ANALYSIS

All of the claims asserted in Scott's petition were adjudicated on the merits by the Mississippi Supreme Court in his direct appeal.[2] They are therefore subject to the highly

---

[2]Scott raised the claims encompassed in ground one of his present petition again in his motion for post-conviction relief. The supreme court held that they were barred under the *res judicata* portions of Mississippi's post-conviction relief statute, Miss. Code Ann. § 99-39-21(2) and (3). The court ruled in the alternative that Scott had failed to make a substantial showing of the denial of a state or federal right. *See*

deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), which allows habeas relief in this case only if the state court's rejection of Scott's claims involved "an unreasonable application of . . . clearly established Federal law . . . as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts" in light of the evidence presented to the state court. *Id.* The Supreme Court has repeatedly emphasized that " 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, the application must be not only incorrect but also "objectively unreasonable." *Renico,* 130 S.Ct. at 1862 (quoting *Williams*, 529 U.S. at 409). Furthermore, if a claim has been adjudicated on the merits by a state court, a federal habeas petitioner is limited to the evidentiary record that was before the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011).

This court's review of Scott's claims of ineffective assistance of counsel is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Analysis of ineffective assistance claims begins with the well-known test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), a test which is "highly deferential," *id* 689. Under *Strickland's* two-

---

Miss. Code Ann. § 99-39-27(5). Accordingly, for purposes of this court's analysis under § 2254(d), the relevant state court adjudication on the merits of all of Scott's claims was the decision of the state supreme court in Scott's direct appeal.

prong analysis, a petitioner must first show that his attorney's performance was deficient. 466 U.S at 688. "Deficient" means that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 690. If a petitioner succeeds in establishing deficiency on his counsel's part, then he must go on to demonstrate that his attorney's deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. As stated, the standard of review of an attorney's performance is "highly deferential," and a court considering an ineffectiveness claim is to "indulge a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance." *Id.* at 689.

The difficulty faced by a habeas petitioner in seeking to establish a claim of ineffective assistance is compounded when the claim is viewed through the lens of § 2254(d). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter,* 131 S.Ct. 770, 788 (2011).

In short, a habeas petitioner's burden of overcoming AEDPA's deferential standard of review is an extremely difficult one; the burden only increases where a petitioner is asserting ineffective assistance claims.

## A. *Ex Parte Hearings*

Grounds one, two and a portion of four arise out of communications between Scott and his attorney and the attorney's efforts to respond to those communications in a

manner consistent with his ethical obligations under the Mississippi Professional Rules of Conduct. A few days prior to trial, Knapp filed a motion to withdraw in which he stated that he had "a realistic and serious concern" regarding Rule 3.3 of the Mississippi Rules of Professional Conduct.[3] The court held a hearing on the motion on the morning prior to trial. At the hearing, defense counsel informed the court that a situation had arisen which would cause him to violate those portions of Rule 3.3 prohibiting a lawyer from knowingly failing "to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client" and from offering evidence "that the lawyer knows to be false." He then requested, and was granted, an in-chambers *ex parte* hearing, at which only Knapp, his assistant counsel, the judge, and court personnel were present. In the hearing, Knapp stated that his client had told him that he committed the crime but that he nevertheless intended to create an alibi by having witnesses testify that he was with them at the time. Counsel also stated that Scott informed him that he intended to take the stand and testify falsely that he did not commit the crime. Knapp told the court that he had tried to dissuade his client from this course of action but had been unsuccessful. The Court denied the motion to withdraw, reasoning that any subsequent attorney appointed for Scott would be faced with the same dilemma.

Defense counsel renewed his motion to withdraw at the close of the state's evidence, and another in-chambers conference was held, again, with only defense counsel, the judge, and court personnel present. Concluding that counsel could avoid violation of the ethical cannons if his client were to testify without counsel's assistance,

---

[3]Rule 3.3 is entitled "Candor toward the tribunal."

the court entered a written order denying the motion to withdraw and stating that the defendant would be allowed to testify in a narrative form on direct. Thereafter, Scott testified that he was at home in bed until early afternoon on the day of the crime and that he did not kill Paula Dinkins.[4]

Scott contends that his exclusion from these two *ex parte* hearings violated his rights to due process. He reasons that had he been present, he could have denied or rebutted his attorney's claims and could have invoked the attorney/client privilege.

A criminal defendant has a constitutional right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-106, 108 ((1934)). The *ex parte* hearings in the present case concerned whether Scott's attorney should be allowed to withdraw and the manner in which Scott's testimony would be presented, given Scott's stated intention to commit perjury. They did not bear a "reasonably substantial" relationship to his ability to present a legitimate defense. It follows that the state court's rejection of this ground for relief was not unreasonable in light of clearly-established Supreme Court law.

Scott also alleges that he was denied his right to counsel in these hearings and that

---

[4]As contemplated by the order, Scott's testimony began as a narrative for which his attorney provided little assistance. Inexplicably, however, defense counsel later became actively involved in presenting the very testimony from which he had previously tried to distance himself. In questioning Scott, Knapp asked whether Scott had robbed the Cash Depot, whether he had pointed a gun at Dinkins, and whether he had killed her.

Knapp rendered ineffective assistance in revealing his confession and intentions to the trial judge. There is no merit to this claim. "[T]he right to counsel includes no right to have a lawyer who will cooperate with planned perjury." *Nix v. Whiteside*, 475 U.S. 157, 173 (1986).

In ground two, Scott seeks habeas relief based upon the trial judge's failure to recuse herself after learning of Scott's confession to his attorney. In Scott's direct appeal, the Mississippi Court of Appeals reversed and remanded on this issue, holding that once the trial judge became aware that Scott had confessed, due process required that she recuse herself. In so holding, the court of appeals focused on the trial judge's role as a fact-finder in ruling on Scott's motion to suppress, which was heard immediately following the first *ex parte* conference:

> We see no escape from the conclusion that a reasonable person, knowing that a judge has been informed by the defendant's lawyer that the defendant confessed, would harbor serious doubts about the judge's impartiality in ruling on the motion to suppress.
>
> . . .
>
> We find that Scott was denied a fair trial when the judge failed to recuse herself from judging Scott's motion to suppress.

8 So. 3d at 885.

The Mississippi Supreme Court rejected this line of reasoning. It observed that while the trial judge made factual determinations in ruling on the motion to suppress, those determinations concerned whether Scott's confession was voluntary, intelligent, and knowing, not whether the defendant was in fact guilty or whether the confession was true. In the supreme court's view, a trial judge's knowledge that a defendant has confessed to

the crime is hardly an extraordinary circumstance.  The court pointed out

that trial judges are frequently made aware that a criminal defendant has confessed to the

crime but that they are nevertheless expected, and presumed, to be impartial.  The court

also pointed out, as had the dissent in the lower court, that recusal would not have

remedied the situation, as any future trial judge would have read the record and been

aware of the *ex parte* proceedings.  Focusing on the trial as a whole, the supreme court

concluded that there was nothing to indicate that the trial judge was not impartial.

The due process clause requires disqualification of a judge "only in the most

extreme of cases."  *Public Citizen, Inc. v. Bomer,* 274 F.3d 212, 217 (5th Cir. 2001) (citing

*Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821, 825-26 (1986)).  Where the trial judge is

not the ultimate trier of fact, the judge's knowledge that the defendant has confessed to

the crime is not a "most extreme of cases" such that recusal is required.  Furthermore,

there is no indication in the record that the trial judge was biased or prejudiced against

Scott in any way.  The state court's rejection of this claim was reasonable, and no relief is

warranted.

### B.  Speedy Trial

In ground three of the petition, Scott argues that he was denied his Sixth

Amendment right to a speedy trial.  Constitutional claims based upon a delay prior to trial

are analyzed under the four-prong test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972).

Under *Barker*, the factors to be weighed are (1) length of delay, (2) reason for the delay,

(3) the accused's assertion of his right to a speedy trial, and (4) prejudice to the accused.

*Id*. at 530.  The threshold inquiry is whether the length of the delay is "presumptively

prejudicial." *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002). If so, the court is required to continue with an analysis of the remaining factors. *Id.*

Petitioner was arrested on July 23, 2002, but was not tried until March 28, 2005. The chronology of relevant events is as follows:

| | |
|---|---|
| July 23, 2002 | Arrest |
| December 10, 2002 | Indictment |
| April 3, 2003 | Arraignment |
| April 21, 2003 | Order continuing trial at the request of defense |
| July 14, 2003 | Order continuing trial at the request of defense |
| January 19, 2004 | Order continuing trial at the request of defense |
| November 5, 2004 | Order continuing trial and setting trial date of March 28, 2005 |
| February 9, 2005 | Motion to suppress, in which Scott stated he was asserting his right to a speedy trial |
| March 10, 2005 | Motion to dismiss for violation of right to a speedy trial |
| March 21, 2005 | Motion to dismiss for violation of right to a speedy trial |
| March 28, 2005 | Trial |

The Mississippi Supreme Court's analysis of this issue is brief. The court apparently found the length of the delay to be presumptively prejudicial, as it went on to consider the other factors, all of which it found weighed against Scott. The court determined that the delay was largely attributable to Scott, although somewhat attributable to a crowded docket, that Scott had not asserted his right to a speedy trial, and that there was no evidence of prejudice.

The brevity of the state court's discussion of this claim, however, is not determinative, as this court reviews the ultimate result of the state court's decision, not its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Furthermore, where a petitioner's speedy trial claim has been adjudicated on the merits by the state court, the petitioner bears an especially heavy burden. The deference afforded the state court decision under § 2254 "is at an apex" due to the "somewhat indeterminate and fact-intensive nature of the speedy trial right." *Divers v. Cain*, 698 F.3d 211, 217 (5th Cir. 2012) (citing *Amos v. Thornton*, 646 F.3d 199, 204-05 (5th Cir. 2011)). Thus, the undersigned proceeds to an analysis of Scott's speedy trial claim not to determine whether the state court's decision was correct, but whether it was objectively reasonable.

*Length of delay.* Approximately two years and eight months lapsed between Scott's arrest and his trial, a period of time well beyond the Fifth Circuit's one-year benchmark, *see Goodrum v. Quarterman*, 547 F.3d 249, 57 (5th Cir. 2008), and therefore sufficient to trigger a full analysis under all of the *Barker* factors. Furthermore, the length of the delay is significant and weighs in Scott's favor.

*Reason for delay.* As noted above, Scott filed three motions for continuance to delay his trial. The trial court granted all three of them. The third order, dated January 19, 2004, continued the trial, at Scott's request, to November 15, 2004. Approximately four months later, Scott's trial was held on March 28, 2005. The trial court stated, *inter alia*, in a March 23, 2005, order that trial was set for March 28, 2005, due to "the court's overcrowded docket." Based on the record, the four-month delay between November 15, 2004, and March 28, 2005, was due to an "overcrowded docket," and the previous

continuances extending up to November 15, 2004, were at Scott's own request.

Addressing this issue, the Mississippi Supreme Court stated that "the delay is largely attributable to Scott and somewhat attributable to a crowded docket." *Scott*, 8 So.3d at 863. Applying *Barker*, the state supreme court determined that this factor weighed against Scott, and that determination is reasonable.

*Assertion of right to a speedy trial.* Scott waited until the month before his trial, and three months after the order setting the trial date, to assert his right to a speedy trial. This is tantamount to no assertion at all. Although he claims that his *pro se* motion to substitute counsel, filed on June 7, 2004, included such an assertion, a reasonable jurist could reject this characterization. The statement relied upon Scott, that he was "ready to go to trial," was contained in Scott's explanation as to why he wanted new counsel. In the motion, Scott contended that his attorneys' strategy had been not to prepare a defense but, rather, merely to attempt to negotiate a plea bargain. Scott stated that a plea bargain was unacceptable to him and that he was ready to go to trial. Thus, given the context, Scott's statement could reasonably be interpreted not as a request for a speedy trial, but as a statement that he preferred to go to trial rather than enter a guilty plea. A reasonable jurist could find that this third factor weighs heavily against Scott.[5]

*Prejudice.* The final *Barker* factor is prejudice to the accused. Which side bears the burden of establishing this final factor depends upon the weighing of the other three. *United States v. Bergfeld*, 280 F.3d 486, 490 (5th Cir. 2002). In the present case, a

---

[5]Scott's motions to dismiss for violation of his right to a speedy trial did not constitute assertions of the right because the relief sought was not a speedy trial, but dismissal. *See Cowart v. Hargett*, 16 F.3d 642, 647 (5th Cir. 1994).

reasonable jurist could have concluded that only one factor - the length of delay - weighed in Scott's favor. With only one factor on his side, Scott bore the burden in state court of putting forth specific evidence of prejudice. *See Divers*, 698 F.3d at 219.

Prejudice refers to the interests which the right to a speedy trial safeguards. Those interests are (1) prevention of oppressive pretrial incarceration, (2) minimization of anxiety and concern by the accused, and (3) limitation of the possibility that the accused's ability to defend against the charge will be impaired by the delay, with the last being the most serious. *Barker,* 407 U.S. at 532. Scott was incarcerated for the entire period between arrest and trial. He claims that because of his detention, he experienced anxiety, was unable to work or attend college, and was unable to see his mother and his child, who lived in another state. As to this latter allegation, he gave no details as to where his mother and child lived, how frequently he had visited them in the past, or why they were unable to visit him in jail. Nevertheless, the undersigned recognizes that Scott undoubtedly experienced anxiety and difficulties as a result of the length of his pretrial detention.

Scott also claims that he suffered prejudice as a result of his attorney's inability to locate witnesses who could have testified for him. The record indicates that Knapp was unable to locate four defense witnesses: Demarco Stewart, Zachary Davis, Leveda Beverly, and Stephanie Bland.[6] Stewart and Davis were Scott's roommates for several

---

[6]Curtis Hearon was subpoened and was not found, but it is unclear which side had the subpoena issued, and Knapp does not include him in statements to the trial court concerning the witnesses whom he was unable to locate. In any event, Scott makes no allegations as to how Hearon's testimony would have been helpful to his defense.

weeks prior to the crime. Scott claims that if they had been located, they would both have testified that Scott was at home on the morning of July 9. Additionally, he states that Davis could have testified that Scott's gun was a .380, not the type of weapon used to kill Dinkins. Scott offered no evidence to the state court, not even his own affidavit, to support his claims that Stewart and Davis would have provided him with an alibi; the only indication of what their testimony would have been is his attorney's indications to the trial court that Scott's witnesses would say Scott had been at home at the time of the robbery and murder.[7] As to any testimony about the type of gun Scott owned, its probative value would have been marginal, in that Scott admitted that he had owned both a 9 mm, the type of gun used in the murder, and a .380.[8]

Leveda Beverly was an employee of the Amoco station next door to the Cash Depot. Scott contends that she could have testified that on the morning of July 9, a black male with sweat running down his face came into the station asking for cigarettes. He also states that Beverly gave a statement to Officer Samuels and provided him with a video tape from the surveillance camera that had captured the man's image. There was no evidence before the state court to support these allegations.[9]

Scott's allegations regarding Stephanie Bland were vague at the state court level,

_____

[7]In his filings in this court, Scott has provided a copy of what appears to be a statement given by Davis on July 24, 2002. Nowhere in this document does Davis mention Scott's whereabouts on the morning of the crime.

[8]He claimed, however, that he had left the .380 in Las Vegas during a recent trip.

[9]Attached to Scott's traverse filed in this court is what appears to be a police report by Officer Samuels containing Beverly's statement. It is consistent with Scott's contentions.

as they are in this court. He states only that Bland gave a detailed statement about a possible suspect.

The state supreme court found that Scott had presented no evidence of prejudice. While the court did not elaborate, such a conclusion was obviously reasonable: Scott's attempt to establish prejudice consisted of little more than his own unsupported allegations.

The Mississippi Supreme Court's conclusion that Scott failed to establish a violation of his Sixth Amendment right to a speedy trial was a reasonable application of *Barker* and was reasonable in light of the evidence (or lack thereof) presented by Scott. Therefore the state court's ruling on ground three must remain undisturbed by this court.

## C. Ineffective Assistance of Trial Counsel

Several of Scott's claims of ineffective assistance of counsel consist of allegations that his trial attorney failed to adequately investigate his case. In his petition, Scott states that Knapp failed to view a potentially exculpatory videotape, failed to interview Antoine Reed, and failed to interview and call as defense witnesses the following individuals: Demarco Stewart, Zachary Davis, Lamin Williams, and Curtis Hearon.

The evidence presented by Scott to the state court in support of his failure-to-investigate claims consisted of the state court record and his own affidavit.[10] In the

---

[10]Normally, Mississippi courts do not consider on direct appeal claims of ineffective assistance of trial counsel. *See Wilcher v. State*, 863 So. 2d 776, 825 (Miss. 2003). This is because an appellant is limited to the trial record in attempting to establish a claim. However, if the claim can be decided solely on the trial record, an appellant court may adjudicate the claim. *See* Miss. R. App. Proc. 22(b) (stating that issues that may be raised in post-conviction proceedings may also be raised on direct appeal if the issues are based on facts apparent from the record). Thus, Scott

affidavit, Scott states as follows:  On numerous occasions while awaiting trial, Scott asked his attorney to interview witnesses, investigate his alibi, interview his roommates, interview a correctional officer who was present at his interrogation in Georgia, and view a surveillance video tape from a business next door to the Cash Depot.  Defense counsel responded to these requests by informing Scott that he had not begun any investigation, that he did not have time to view the video tape, that he did not have time to work on his case, and that he usually did not investigate until two or three weeks before trial.  Scott states in the affidavit that as a result of his attorney's failure to work on his case, he filed numerous *pro se* motions, requested new counsel, filed a bar complaint, and wrote letters to the trial judge, to Knapp, and to the Hinds County Public Defender.

A habeas petitioner may establish deficient performance, the first prong of *Strickland*, by showing that his attorney "failed to make a reasonable investigation prior to trial. *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013).  "Counsel must, 'at a minimum, . . . interview potential witnesses and . . . make an independent investigation of the facts and circumstances in the case.'" *Id.* (quoting *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994)).  In order to satisfy the prejudice prong of *Strickland*, a petitioner must show a reasonable probability that, but for his attorney's failure to interview witnesses or otherwise investigate his case, the result of the trial would have been different.  *Strickland,* 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*  Again, even if this court finds, in its independent

---

was precluded from relying upon evidence outside of the record to support his ineffective assistance claims.  Scott could have offered extrinsic evidence to show ineffective assistance had he chosen to raise these claims in his post-conviction proceeding.

judgement, that Knapp's performance was constitutionally deficient and that Scott was prejudiced thereby, relief is unavailable if there is "any reasonable argument" to the contrary. *Harrington*, 131 S.Ct. at 788.

Three of the individuals whom Scott faults his attorney for failing to interview are characterized by Scott as potential alibi witnesses. Demarco Stewart and Zachary Davis were Scott's roommates in July of 2009. As explained *supra*, although Scott claims that both could have testified that Scott was at home at the time of the crime, there was no evidence before the state court to establish that this would in fact have been their testimony. Scott's third roommate was Lamin Williams. Williams was available at trial, but neither side called him to testify. Scott faults his attorney for failing to interview Williams; however, he provides no argument or explanation as why his attorney should have interviewed Williams. Neither does he claim that his attorney should have called Williams to testify at trial.[11]

Viewed in the most favorable light possible for Scott, the evidence of record indicates that Scott asked Knapp to locate and interview Scott's roommates, that Knapp delayed doing so until approximately two months prior to trial, and that he was unsuccessful in finding Stewart and Davis, even though the prosecution was able to locate Davis.[12] One might conclude that Knapp unreasonably delayed investigation, and that this

---

[11]Attached to Scott's traverse is a document which appears to be a statement by Williams. In the statement, Williams says that he did not really know Scott and that Scott stayed in the home with Williams and Zachary Davis for about two or three weeks. Williams makes no mention of Scott's whereabouts at the time of the murder.

[12]In the *ex parte* hearing on the first day of trial, Knapp, discussing Scott's insistence on putting alibi witnesses on the stand, told the court that he had been trying to locate Scott's alibi witnesses for two months but had been unsuccessful.

delay resulted in the unavailability of witnesses.  But such a conclusion would be based largely on speculation as to precisely what Scott told Knapp and when.  Given the paucity of evidence provided by Scott, it cannot be said that no reasonable jurist could conclude that Knapp had rendered constitutionally sufficient assistance notwithstanding his failure to interview Scott's roommates.

Scott's claim as to Knapp's failure to interview these witnesses is even weaker when considered under *Strickland's* prejudice prong.  Scott does not indicate anything that would have been gained by interviews other than the possibility that they would have testified to an alibi.  Williams was present at trial, and there is no indication that Scott attempted to have him called as a witness; neither does he argue that his attorney *should* have called him.  Thus, he cannot show that he was prejudiced by Scott's failure to interview Williams.  As to Stewart and Davis, the state court could reasonably have refused to find any prejudice because of the speculative nature of Scott's claims as to what these witnesses would have said on the stand.  *Cf. Sayer v. Anderson*, 238 F.3d 631, 636-36 (5th Cir. 2001) (observing that claims of uncalled witnesses are not favored because allegations of how a witness would have testified are "largely speculative.") Furthermore, there was no evidence that Scott ever told his attorney that Davis could testify about the gun Scott owned.  The state court could also have found, given Scott's confession and the other evidence against him, that there was not a reasonable probability that any of this testimony would have changed the outcome of the trial.  No relief is warranted on Scott's claim regarding failure to interview alibi witnesses.

Even less substantial are Scott's contentions and evidence in support of his claim

that Knapp was ineffective in failing to interview two crime scene witnesses, Curtis Hearon and Antoine Reed, and in failing to view a videotape. Curtis Hearon was a Cash Depot customer who had arranged to meet Dinkins that morning. The testimony of other witnesses at trial indicates that Hearon came into the Cash Depot and was waiting for Dinkins when Antoine Reed arrived. Hearon did not testify at trial. Scott argues that his attorney should have interviewed Hearon and called him to testify. In support of his position, he states only that Hearon knew what time Dinkins would arrive at the office. Scott gave no further details to the state court in support of this claim, and it is far from self-evident how or why such testimony would have been material.

Leveda Beverly worked at the Amoco station next door to the Cash Depot. According to Scott, Beverly could have testified that on the morning of the crime, a black male with sweat running down his face came into the station asking for cigarettes. In his state court filings, Scott stated that Beverly gave a statement to police and turned over to them a surveillance tape that captured the man at the store. He argues that Knapp was ineffective for his failure to review the videotape. However, Scott provided the state court with no evidence to support these allegations.

Finally, Scott contends that his attorney should have interviewed Antoine Reed prior to trial. Reed, the assistant manager of the Cash Depot, testified that he found Dinkins lying in a pool of blood in front of the open safe. Knapp cross-examined Reed at trial. In presenting this issue to the state court, Scott failed to give any explanation as to what information an interview would have yielded or how it could have helped his defense.

In order to establish that an attorney was ineffective for failure to investigate, a habeas petitioner "must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005). Scott gave no such specifics to the state court concerning the witnesses he claims Knapp should have interviewed and the video tape he claims he requested Knapp review. Because a reasonable jurist could conclude that Scott failed to establish that his attorney's performance fell short of *Strickland's* deferential standard, habeas relief is unavailable. *See Harrington*, 131 S.Ct. at 788.

Scott's remaining ineffective assistance claims merit only brief discussion. Scott takes issue with his attorney's failure to object to his detention in Georgia and to argue that the evidence therefrom was inadmissible as "fruit of the poisonous tree." Scott's theory is that his arrest and detention in Georgia were illegal because they were only pretext for enabling authorities to question him about the Cash Depot robbery and murder. Scott has offered no authority to indicate that there was anything unlawful in his being arrested and held on unrelated charges in order that he might be questioned concerning the robbery and murder of Dinkins. Without an argument as to the basis for the objection he claims his attorney should have made, his claim of ineffective assistance fails; an attorney is not ineffective for failing to make meritless objections. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994). Furthermore, Scott was arrested on valid warrants, and the trial court found that his confession was made after he had been read his Miranda rights and was knowing, intelligent and voluntary. This claim of ineffective assistance is without merit.

Scott next complains that his attorney failed to object to the admission of Scott's previous crime of embezzlement, his desertion from the military, and charges of possession of an altered social security card and a stolen license plate. Scott testified to the embezzlement and the charges for possession of an altered social security card and a "bogus" license plate in the narrative portion of his direct testimony, without assistance or prompting from his attorney. On cross-examination, Scott testified about his desertion from the military, and his attorney raised an objection. Scott has no basis for an ineffective assistance claim regarding any of this testimony.

Finally, Scott contends that his attorney should have objected to the prosecutor's characterization in closing argument of Scott as a "shyster" and a "con artist." While these terms are undoubtedly pejorative, they were supported by the evidence, which established that Scott had been convicted of embezzlement, theft, and use of a stolen ATM card, that he had placed an unlawful license plate on his car, and that he had cheated Marcus Bennett out of a gun. Scott's attorney's decision not to object and call even more attention to these remarks represented reasonable trial strategy, especially in light of the lack of any legal basis for an objection.

## IV. CONCLUSION

Petitioner has failed to establish that the state court's adjudication of any claim considered by it on the merits was contrary to, or involved an unreasonable application of, clearly established Supreme Court law or was based upon an unreasonable determination of the facts. Accordingly, the undersigned recommends that habeas relief be denied and the petition be dismissed with prejudice.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court.  28 U.S.C. § 636; Fed. R. Civ. P. 72(b); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Respectfully submitted, this the 29th day of July, 2013.

/s/ F. Keith Ball
UNITED STATES MAGISTRATE JUDGE